No. 23-10946

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

WARD LAWRENCE KENYON,

*Plaintiff-Appellant,*

v.

CITY OF SEBASTIAN; BRAEDEN NEVUE, individually and in his
capacity as a City of Sebastian Police Officer; and MELISSA
GARRISON, individually and in her capacity as a City of Sebastian
Police Officer,

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
DOCKET NO. 2:21-CV-14392-AHS

**SUPPLEMENTAL BRIEF OF PLAINTIFF-APPELLANT
WARD LAWRENCE KENYON**

Abby Wright
Sameer Aggarwal
  *Counsel of Record*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
saggarwal@cov.com

*Counsel for Plaintiff-Appellant
Ward Lawrence Kenyon*

August 27, 2025

Case No. 23-10946
*Ward Lawrence Kenyon v. City of Sebastian, et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rules 26.1-2(c) and 42-1(a), Plaintiff-Appellant Ward Lawrence Kenyon hereby submits a full list of persons and entities known to Mr. Kenyon to have an interest in the outcome of this case:

1. Aggarwal, Sameer, associate, Covington & Burling LLP, counsel for Plaintiff-Appellant;

2. Amigo, Andrea G., former attorney, Roberts, Reynolds, Bedard & Tuzzio, PLLC, counsel for Defendant City of Sebastian;

3. City of Sebastian, Defendant-Appellee;

4. Cockcroft, Jennifer, city attorney, Defendant City of Sebastian;

5. Covington & Burling LLP, counsel for Petitioner;

6. Garrison, Melissa, Defendant-Appellee;

7. Jimenez, James R., partner, Roberts, Reynolds, Bedard & Tuzzio, PLLC, counsel for Defendant City of Sebastian;

8. Kenyon, Ward Lawrence, Plaintiff-Appellant;

Case No. 23-10946

*Ward Lawrence Kenyon v. City of Sebastian, et al.*

9.  Nevue, Braeden, Defendant-Appellee;

10. Preferred Governmental Insurance Trust;

11. Reynolds, Lyman H., partner, Roberts, Reynolds, Bedard & Tuzzio, PLLC, counsel for Defendant City of Sebastian;

12. Roberts, George P., partner, Roberts, Reynolds, Bedard & Tuzzio, PLLC, counsel for Defendant City of Sebastian;

13. Roberts, Reynolds, Bedard & Tuzzio, counsel for Defendant-Appellee City of Sebastian;

14. Roper, Townsend & Sutphen, P.A., former counsel for Defendants-Appellees Nevue and Garrison;

15. Scott, Dale A., attorney, Tessitore Mari Scott, PLLC, counsel for Defendants-Appellees Nevue and Garrison;

16. Singhal, Hon. Raag, United States District Judge;

17. Tessitore Mari Scott, PLLC, counsel for Defendants-Appellees Nevue and Garrison;

18. Wright, Abby, of counsel, Covington & Burling LLP, counsel for Plaintiff-Appellant.

Case No. 23-10946
*Ward Lawrence Kenyon v. City of Sebastian, et al.*

Pursuant to Circuit Rule 26.1-3(b), Counsel further certifies that, to the best of Counsel's knowledge, no publicly traded company or corporation has an interest in the outcome of the case or appeal. Counsel will file an amended certificate of interested persons should he become aware of a change in interests that would affect the disclosures as required by Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-4.

*/s/ Sameer Aggarwal*
Sameer Aggarwal

*Counsel for Plaintiff-Appellant*
*Ward Lawrence Kenyon*

August 27, 2025

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Circuit Rule 28-1(c), Plaintiff-Appellant Ward Lawrence Kenyon respectfully requests oral argument. Oral argument is warranted because this case presents important questions about (1) the standard for deliberate indifference under the Fourteenth Amendment and whether state officers violate the relevant standard when they fail to administer emergency medical care to arrestees in state custody who have been shot by the officers; (2) whether state officers used excessive force when they started shooting at an arrestee without knowing whether he had a firearm; and (3) whether a municipality is liable when it fails to train its officers on the use of deadly force.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ......................................................... C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... i

TABLE OF AUTHORITIES ....................................................... iv

STATEMENT OF JURISDICTION ............................................... ix

INTRODUCTION .................................................................. 1

STATEMENT OF THE ISSUES .................................................... 2

STATEMENT OF THE CASE .................................................... 3

    A.   Factual Background ................................................. 3

    B.   Procedural History ................................................. 8

SUMMARY OF ARGUMENT .................................................... 10

LEGAL STANDARD ............................................................ 14

ARGUMENT .................................................................... 14

I.   Mr. Kenyon States a Claim for Deliberate Indifference to His
    Serious Medical Needs. ........................................... 14

    A.   The Officers Were Deliberately Indifferent to Mr.
       Kenyon's Severe Injuries in Violation of the Fourteenth
       Amendment. ...................................................... 15

          1.   Mr. Kenyon Had an Objectively Serious Medical
             Need................................................................ 16

          2.   The Officers Were Deliberately Indifferent to Mr.
             Kenyon's Serious Medical Needs. ................................. 17

          3.   The Contrary Contentions of the District Court
             and the Officers Fail. .............................................. 26

B.      Qualified Immunity Does Not Save the Officers from This Suit. ...............................................................29

II.     Mr. Kenyon States a Claim for Excessive Force. ..........................36

    A.      The Officers Used Excessive Force in Violation of the Fourth Amendment.................................................36

    B.      The Officers Are Not Entitled to Qualified Immunity for Their Excessive Use of Force..........................................45

III.    Mr. Kenyon States a Claim Against the City. ..............................47

IV.     The District Court Should Reconsider Supplemental Jurisdiction........................................................................51

CONCLUSION ........................................................................52

CERTIFICATE OF COMPLIANCE........................................................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases***

*Betty Wade v. McDade,*
106 F.4th 1251 (11th Cir. 2024) (en banc) ................................. 23, 24

*Bilal v. Geo Care, LLC,*
981 F.3d 903 (11th Cir. 2020) ............................................................. 14

*\*Bozeman v. Orum,*
422 F.3d 1265 (11th Cir. 2005) (per curiam) .................... 19–21, 33, 34

*Bravo v. Loor-Tuarez,*
727 F. App'x 572 (11th Cir. 2018) ...................................................... 52

*Brawner v. Scott County,*
14 F.4th 585 (6th Cir. 2021) ............................................................... 24

*Brooks v. Miller,*
78 F.4th 1267 (11th Cir. 2023) ........................................................... 15

*Brown v. Hughes,*
894 F.2d 1533 (11th Cir. 1990) ..................................................... 30, 33

*City of Canton v. Harris,*
489 U.S. 378 (1989) ....................................................................... 48, 50

*City of Revere v. Mass. Gen. Hosp.,*
463 U.S. 239 (1983) ............................................................................ 15

*Dang ex rel. Dang v. Sheriff, Seminole Cnty.,*
871 F.3d 1272 (11th Cir. 2017) .......................................................... 24

---

\* The authorities on which Mr. Kenyon primarily relies are identified with an asterisk.

iv

*Darnell v. Pineiro*,
    849 F.3d 17 (2d Cir. 2017) ................................................... 24

*Depew v. City of St. Marys*,
    787 F.2d 1496 (11th Cir. 1986) .......................................... 49

*Devengoechea v. Bolivarian Republic of Venezuela*,
    889 F.3d 1213 (11th Cir. 2018) .......................................... 14

*Erickson v. Pardus*,
    551 U.S. 89 (2007) .............................................................. 14

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ............................................................ 17

*Favors v. City of Atlanta*,
    849 F. App'x 813 (11th Cir. 2021) ...................................... 50

*Gilmore v. Ga. Dep't of Corr.*,
    144 F.4th 1246 (11th Cir. 2025) (en banc) ................... 29, 34

*Goebert v. Lee County*,
    510 F.3d 1312 (11th Cir. 2007) .......................................... 23

*Gold v. City of Miami*,
    151 F.3d 1346 (11th Cir. 1998) .......................................... 48

*Gordon v. County of Orange*,
    888 F.3d 1118 (9th Cir. 2018) ............................................ 24

*Graham v. Connor*,
    490 U.S. 386 (1989) ............................................................ 36

*Harris v. Coweta County*,
    21 F.3d 388 (11th Cir. 1994) .............................................. 30

*Heeter v. Bowers*,
    99 F.4th 900 (6th Cir. 2024) ............................ 22, 27, 28, 34, 35

*Holloman ex rel. Holloman v. Harland*,
    370 F.3d 1252 (11th Cir. 2004) .......................................... 45

v

*Hope v. Pelzer,*
  536 U.S. 730 (2002) ...................................................................29

*Hunter v. City of Leeds,*
  941 F.3d 1265 (11th Cir. 2019) ...................................................40, 42

*Jones v. City of Cincinnati,*
  521 F.3d 555 (6th Cir. 2008) .............................................................35

*Kingsley v. Hendrickson,*
  576 U.S. 389 (2015) ...........................................................................23

*Kisela v. Hughes,*
  584 U.S. 100 (2018) ...........................................................................29

*Lancaster v. Monroe County,*
  116 F.3d 1419 (11th Cir. 1997) ...................................................30, 31

*Lemire v. Cal. Dep't of Corr. & Rehab.,*
  726 F.3d 1062 (9th Cir. 2013) ...........................................................35

*Littlejohn v. Sch. Bd. of Leon Cnty.,*
  132 F.4th 1232 (11th Cir. 2025) ........................................................14

*Lundgren v. McDaniel,*
  814 F.2d 600 (11th Cir. 1987) ................................................40, 46, 47

*McDowell v. Brown,*
  392 F.3d 1283 (11th Cir. 2004) .........................................................47

*McElligott v. Foley,*
  182 F.3d 1248 (11th Cir. 1999) .........................................................33

*McRaven v. Sanders,*
  577 F.3d 974 (8th Cir. 2009) ........................................................27, 35

*Mercado v. City of Orlando,*
  407 F.3d 1152 (11th Cir. 2005) ...................................................45, 46

*Miranda v. County of Lake,*
  900 F.3d 335 (7th Cir. 2018) .............................................................24

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
    436 U.S. 658 (1978) ........................................................................ 9, 47

*Morton v. Kirkwood*,
    707 F.3d 1276 (11th Cir. 2013) ............................................. 37, 39, 46

\*Nicholas Wade v. Daniels*,
    36 F.4th 1318 (11th Cir. 2022) ........................16, 19, 20, 22, 26, 28, 32

*Oliver v. Fiorino*,
    586 F.3d 898 (11th Cir. 2009) ............................................................ 36

*Palmer v. Hosp. Auth. of Randolph Cnty.*,
    22 F.3d 1559 (11th Cir. 1994) ............................................................ 52

\*Patel v. Lanier County*,
    969 F.3d 1173 (11th Cir. 2020) ............................. 18, 20, 21, 25, 30, 31

*Payton v. City of Florence*,
    413 F. App'x 126 (11th Cir. 2011) ..................................................... 52

\*Perez v. Suszczynski*,
    809 F.3d 1213 (11th Cir. 2016) ............................................... 39, 44–46

*Salvato v. Miley*,
    790 F.3d 1286 (11th Cir. 2015) ....................................... 41, 43, 45, 46

*Saunders v. Duke*,
    766 F.3d 1262 (11th Cir. 2014) ......................................................... 38

*Short v. Hartman*,
    87 F.4th 593 (4th Cir. 2023) ............................................................. 24

*St. Paul Fire & Marine Ins. Co. v. Nat'l Union Fire Ins. Co.*,
    890 F.3d 1265 (11th Cir. 2018) ......................................................... 51

*Stalley v. Cumbie*,
    124 F.4th 1273 (11th Cir. 2024) ....................................................... 17

*Taylor v. Hughes*,
    920 F.3d 729 (11th Cir. 2019) ........................................................... 16

*Tennessee v. Garner*,
   471 U.S. 1 (1985)................................................................ 37, 45

*Turner v. Jones*,
   415 F. App'x 196 (11th Cir. 2011)...................................... 52

\*Valderrama v. Rousseau*,
   780 F.3d 1108 (11th Cir. 2015)............................ 17–21, 25, 26, 30–34

*Vaughan v. Cox*,
   343 F.3d 1323 (11th Cir. 2003)..................................... 37, 43

*Vineyard v. County of Murray*,
   990 F.2d 1207 (11th Cir. 1993)................................... 49, 50

*Whatley v. Warden, Ware State Prison*,
   802 F.3d 1205 (11th Cir. 2015)........................................ 44

## STATEMENT OF JURISDICTION

Plaintiff Ward Lawrence Kenyon's complaint raises claims for violations of his federal constitutional rights under 42 U.S.C. § 1983 and related state-law claims. Am. Compl. ¶¶ 47–140 (DE 21). The district court had subject matter jurisdiction to consider those claims under 28 U.S.C. §§ 1331 and 1367. The district court entered final judgment dismissing Mr. Kenyon's suit on February 28, 2023 (DE 60), and Mr. Kenyon timely appealed on March 23, 2023 (DE 61). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

For nearly ten minutes, Ward Lawrence Kenyon lay on the floor of a bar handcuffed and bleeding profusely from multiple gunshot wounds. During those ten minutes, the police officers of the Sebastian Police Department—who shot at Mr. Kenyon sixteen times in a crowded bar—refused to provide first aid despite their training and access to the necessary supplies. It was not until a police officer from another department arrived on the scene that Mr. Kenyon received the medical care he needed to stabilize his injuries before emergency medical services (EMS) personnel arrived.

The Sebastian officers' (the Officers) complete disregard of Mr. Kenyon's obvious and serious medical needs violated his Fourteenth Amendment rights. Mr. Kenyon sustained life-threatening injuries, and this Court has made clear that a delayed response of even a few minutes in the context of gunshot wounds can constitute deliberate indifference because it can represent the difference between life and death. Every reasonable law enforcement officer knows—as the officer from the other department here did—that ignoring an individual with multiple gunshot

wounds while waiting for EMS puts that individual's life at risk and violates his constitutional rights.

The defendants' transgressions, and the district court's errors, do not end there. The district court overlooked allegations that one of the officers began shooting before he knew whether Mr. Kenyon had a firearm. At this stage of proceedings that allegation must be taken as true, and Mr. Kenyon has therefore stated an excessive force claim. And because the City of Sebastian did not train this officer on the use of deadly force before the incident, a training topic the Supreme Court has described as obvious, Mr. Kenyon has also stated a *Monell* claim.

## STATEMENT OF THE ISSUES

1. Whether Mr. Kenyon's allegations concerning the Officers' failure to administer medical care in the ten minutes following Mr. Kenyon's gunshot wounds state a claim for deliberate indifference to medical needs in violation of the Due Process Clause of the Fourteenth Amendment.

2. Whether Mr. Kenyon's allegations that the Officers fired sixteen gunshots at him without knowing that he had a firearm state a claim for excessive force in violation of the Fourth Amendment.

3.      Whether Mr. Kenyon stated a claim against the City of Sebastian based on its failure to train its officers regarding the use of excessive force.

4.      Whether the district court should retain supplemental jurisdiction over Mr. Kenyon's state-law claims.

## STATEMENT OF THE CASE

### A.      Factual Background

On October 9, 2017, Mr. Kenyon visited Earl's Hideaway Lounge in Sebastian, Florida. Am. Compl. ¶ 25 (DE 21). Around 10:30 p.m., two police officers from the Sebastian Police Department, Officer Braeden Nevue and Officer Singh, approached Mr. Kenyon and asked if they could "talk outside." *Id.* ¶ 26. Neither officer indicated that Mr. Kenyon was under arrest or that they had a warrant for his arrest. *Id.*

Mr. Kenyon began walking towards the west exit of Earl's, and after he moved about fifteen feet, Officers Nevue and Singh simultaneously grabbed Mr. Kenyon without notice or warning. *Id.* Surprised by the officers' actions and uncertain why he was being physically restrained after simply being asked to talk, Mr. Kenyon attempted to pull away from the officers, but they slammed him against the wall. *Id.* ¶ 28. Around this

3

time, Officer Melissa Garrison also entered Earl's and joined the other officers attempting to restrain Mr. Kenyon. *Id.*

Mr. Kenyon partially broke away from the officers and continued moving towards the west exit of Earl's. *Id.* ¶ 29. Mr. Kenyon was armed and, hoping to discard the firearm, held the firearm in his right hand pointed at the ground. *Id.* ¶ 30. Officer Singh spotted the firearm, grabbed Mr. Kenyon's hand, and ultimately ended up on top of Mr. Kenyon's back. *Id.* Officer Nevue, on the other hand, "could not see the gun" and did not know that Mr. Kenyon had a weapon. *Id.*

Although Officer Nevue did not know about Mr. Kenyon's weapon and therefore had no reason to believe Mr. Kenyon posed an immediate threat to the safety of the officers or anyone else, Officer Nevue drew his firearm and shot five rounds at Mr. Kenyon's backside. *Id.* ¶¶ 31–32. He took this reckless action and created a zone of risk even though Officer Singh was in his line of fire, as were several bystanders. *Id.*

As Officer Nevue fired those rounds, Mr. Kenyon and Officer Singh fell to the ground, and five sheets of plywood that had been leaning against the wall fell towards them. *Id.* ¶ 34. The plywood ended up leaning against the edge of the nearby pool table, which prevented it from

falling directly onto Mr. Kenyon and Officer Singh. *Id.* Officer Singh then got up and exited the building, which took approximately five seconds. *Id.* ¶ 35. Meanwhile, Mr. Kenyon crawled underneath the pool table to attempt to shield himself from Officer Nevue's gunfire. *Id.* While Mr. Kenyon was underneath the pool table, Officer Nevue continued shooting at him. Officer Nevue fired an additional ten rounds, for a total of fifteen shots. *Id.* ¶ 36.

During this time, Officer Garrison had moved to ensure that she was not in Officer Nevue's line of fire. *Id.* ¶ 33. From her new position approximately twenty-five feet away, Officer Garrison also drew her firearm and shot at Mr. Kenyon at least once while he was underneath the pool table. *Id.* ¶¶ 33, 36.

In total, the Officers fired sixteen shots at Mr. Kenyon in a thirteen-second span. *Id.* ¶¶ 36–37. Security footage shows that Office Nevue fired his first shot at 10:30:58 p.m. and ceased firing at 10:31:11 p.m. *Id.* ¶ 37. Officer Garrison drew her weapon at 10:31:06 p.m. and fired it one second later. *Id.* Officer Garrison then called on her radio, saying "shots fired, shots fired 230 Kenyon has a firearm" and "shots fired in the bar, shots

fired in the bar." *Id.* ¶ 38. Dispatch responded, "22:30 10-39 EMS," and Officer Garrison confirmed "EMS." *Id.*

At 10:31:14 p.m., Mr. Kenyon discarded his firearm from underneath the pool table and exited unarmed with his hands up. *Id.* ¶ 37. Mr. Kenyon suffered several visible injuries and gunshot wounds and was bleeding profusely from several areas, including his left thigh and right rib cage. *Id.* ¶ 39. His left hand had also been severely injured: his index fingertip and middle finger had been shot off, and his middle finger was hanging in his palm. *Id.*

Officers Nevue and Garrison then approached Mr. Kenyon, as did Officer Eugene Carroll, first making contact at 10:31:35 p.m. *Id.* ¶¶ 37. Officers Carroll and Garrison restrained Mr. Kenyon with handcuffs, and he was fully secured at 10:32:48 p.m. *Id.* ¶¶ 39–40. From this point forward, the Officers provided no first aid to Mr. Kenyon, even though any threat to their safety had fully abated and Officer Nevue had his medical kit—which includes a tourniquet as one of the supplies—in his police car, which was sitting outside of Earl's. *Id.* ¶¶ 40–41, 43.

Officer Garrison also did not administer medical assistance. *Id.* ¶ 42. Although she was the onsite supervisor, she did not herself provide first aid or direct any of the other officers to provide first aid. *Id.*

About ten minutes later, Officer Matthew Radock of the Fellsmere Police Department arrived on the scene and began to assist Mr. Kenyon. *Id.* ¶ 40. At 10:42:34 p.m., Officer Radock used Mr. Kenyon's belt as a torniquet on Mr. Kenyon's left leg to try to stop the bleeding. *Id.* The torniquet was fully applied at 10:44:00 p.m., and EMS arrived on the scene shortly thereafter, at 10:44:26 p.m. *Id.* ¶¶ 40, 44.

Because of the Officers' actions Mr. Kenyon is permanently disabled. He has drop foot and chronic neuropathy in his left leg; a shattered femoral shaft in his left leg required insertion of a titanium rod that caused an infection and four additional surgeries; he lost his middle finger and part of the index finger on his left hand; he can only partially rotate the proximal radius bone in his left forearm; and he has a partial pelvic replacement in his right hip. *Id.* ¶ 46. Mr. Kenyon also suffered extreme mental anguish and emotional trauma stemming from this incident and has been diagnosed with post-traumatic stress disorder. *Id.*

### B.    Procedural History

1. In September 2021, Mr. Kenyon filed a pro se complaint against the City of Sebastian, Officer Nevue, and Officer Garrison. DE 1. The district court screened Mr. Kenyon's complaint under 28 U.S.C. §§ 1915A and 1915(e) and concluded that his claims against the Officers could proceed, although it dismissed his claim against the City. DE 7.

Mr. Kenyon then moved for leave to file an amended complaint (DE 20), which the district court granted and permitted as to all Defendants. DE 33. The Amended Complaint raises two claims against each Officer under 42 U.S.C. § 1983 for violations of Mr. Kenyon's federal constitutional rights. DE 21. Mr. Kenyon alleged that the Officers used excessive force in violation of the Fourth Amendment (Counts II, III) and that the Officers were deliberately indifferent to his medical needs in violation of the Due Process Clause of the Fourteenth Amendment (Count IV). Mr. Kenyon also brought related state law claims against the Officers for negligence (Counts V, VI) and battery (Counts VII, VIII), and he brought a claim against the City under § 1983 for failure to train and supervise its officers on the use of deadly force (Count I).

2. Defendants moved to dismiss the Amended Complaint for failure to state a claim (DE 36, 42), and the district court granted the motions. Order (DE 60). The court first analyzed Mr. Kenyon's claims against the Officers. On the excessive force claims, the court asserted that the Officers' "alleged use of force was objectively reasonable." Order at 9–10. On the deliberate indifference claim, the court acknowledged that Mr. Kenyon's injuries may have amounted to a "serious medical need." The court also acknowledged the ten-minute gap between Mr. Kenyon's handcuffing and any medical care but nonetheless concluded that the Officers "promptly provided medical care." *Id.* at 11–12. Having dismissed the federal claims, the court declined to exercise supplemental jurisdiction over Mr. Kenyon's state-law claims. *Id.* at 12–13.

The court also considered Mr. Kenyon's *Monell* claim against the City. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978). The court held that Mr. Kenyon did not allege that the City "had an official policy or unofficial practice or custom which caused police officers to use excessive force." Order at 13–14. It also held that Mr. Kenyon did not allege "a pattern of similar constitutional violations by untrained employees." *Id.* at 15–16.

Based on these conclusions, the court dismissed Mr. Kenyon's federal claims with prejudice and entered judgment for Defendants. *Id.* at 16–17.

3. Mr. Kenyon timely appealed. DE 61. Mr. Kenyon continued to press his claims in this Court pro se, and the parties completed initial merits briefing on August 19, 2024. On May 30, 2025, the Court sua sponte directed that counsel be appointed to represent Mr. Kenyon in his appeal pursuant to Addendum Five of this Court's Rules. On June 9, 2025, the Court appointed the undersigned to file a supplemental brief on Mr. Kenyon's behalf.

## SUMMARY OF ARGUMENT

The district court erred in dismissing Mr. Kenyon's claims against the Officers and the City. This Court should reverse that judgment because Mr. Kenyon states claims for relief and qualified immunity is not warranted.

I. The Officers were deliberately indifferent to Mr. Kenyon's serious medical needs in violation of the Fourteenth Amendment when they allowed him to lay fully restrained and bleeding profusely for nearly ten minutes without providing any type of medical assistance or first aid.

Mr. Kenyon sustained several gunshot wounds after the Officers fired sixteen shots at him, and his injuries were clear and obvious. Despite these injuries, the Officers failed to provide any type of medical assistance, even though Mr. Kenyon had been handcuffed and any purported risks to the Officers had fully dissipated. The imminent risks to Mr. Kenyon were readily apparent, however, as evidenced by the fact that a police officer from another department began administering first aid soon after arriving on the scene.

In cases involving life-threatening injuries, this Court has held that the length of delay in delivering first aid must be measured in minutes. And under that standard, it has held that delays of four minutes and seven minutes can constitute deliberate indifference. Applying that same standard here, Mr. Kenyon has stated a claim that the Officers violated his rights when they stood idle during the ten-minute period before EMS arrived and during which he severely bled from his gunshot wounds. Calling for EMS support alone is insufficient when the Officers had the appropriate medical training and supplies to provide timely and necessary first aid.

11

Because Mr. Kenyon's claims arise under the Fourteenth Amendment, rather than the Eighth Amendment, he need only show that the Officers' actions were objectively unreasonable. But even if he must show that the Officers acted recklessly, he has plausibly alleged that the Officers knew that their failure to assist Mr. Kenyon placed him at a substantial risk of harm given the severity of his injuries.

The Officers are also not entitled to qualified immunity. This Court's caselaw clearly establishes that, in the context of life-threatening injuries, delays of even a few minutes can constitute deliberate indifference. And it would have been clear and obvious to reasonable officers that doing nothing for ten minutes while Mr. Kenyon lay bleeding from gunshot wounds was not an adequate response.

II.    Mr. Kenyon has also stated a claim for excessive use of deadly force, in violation of the Fourth Amendment. The Officers fired sixteen shots at Mr. Kenyon—fifteen of which were fired by an officer who Mr. Kenyon alleges never saw that he had a firearm. And, according to the Amended Complaint, Mr. Kenyon's firearm was pointed at the ground, and he did not make any aggressive movements with it.

This Court's caselaw clearly establishes that the mere presence of a firearm alone is insufficient to establish a serious threat of harm to police officers and that other factors are relevant, including where the weapon was and how it was being handled. Analyzing those factors and making all inferences in Mr. Kenyon's favor, Mr. Kenyon has plausibly alleged that the Officers' use of deadly force was excessive. That is especially true here where the Officers could not reasonably believe that Mr. Kenyon was trying to escape and they failed to provide him with any verbal warning or instruction before they began shooting at him.

Qualified immunity also does not apply here because the right to be free from excessive force is well established. This Court's caselaw has long made clear that the presence of a firearm alone is insufficient to justify deadly force.

III.    Mr. Kenyon has also stated a claim against the City under *Monell*. The City permitted an officer to work in the field who had not been trained or instructed on the use of deadly force. The Supreme Court has described the need for such training as "obvious," and the City's failure to train its officers in the appropriate manner gives rise to a plausible claim for liability.

IV.    Because Mr. Kenyon has stated federal claims against the Officers and the City, this Court should remand for the district court to reconsider whether to exercise supplemental jurisdiction over Mr. Kenyon's state-law claims.

## LEGAL STANDARD

This Court "review[s] a grant of a motion to dismiss for failure to state a claim de novo, accepting the complaint's allegations as true and construing them in the light most favorable to the plaintiff." *Littlejohn v. Sch. Bd. of Leon Cnty.*, 132 F.4th 1232, 1238 (11th Cir. 2025). It does so "even if [the facts] are subject to dispute." *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1218 n.6 (11th Cir. 2018).

The Court also "liberally construe[s] pro se pleadings and hold[s] them to 'less stringent standards' than [it] appl[ies] to formal pleadings that lawyers draft." *Bilal v. Geo Care, LLC*, 981 F.3d 903, 911 (11th Cir. 2020) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)).

## ARGUMENT

### I.    Mr. Kenyon States a Claim for Deliberate Indifference to His Serious Medical Needs.

The Due Process Clause of the Fourteenth Amendment "requires government officials to provide medical care to those who've been injured

14

during arrest." *Brooks v. Miller*, 78 F.4th 1267, 1284 (11th Cir. 2023) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Claims brought under § 1983 alleging a violation of this right include "both an objective and a subjective inquiry." *Id.* (citation omitted). The objective inquiry considers whether there was "an objectively serious medical need." *Id.* And the subjective inquiry considers whether "the officers were deliberately indifferent to [the] serious medical need." *Id.* Mr. Kenyon satisfies both inquires, and the Officers are not entitled to qualified immunity.

### A. The Officers Were Deliberately Indifferent to Mr. Kenyon's Severe Injuries in Violation of the Fourteenth Amendment.

After the Officers shot at him sixteen times, Mr. Kenyon was "bleeding profusely" from multiple gunshot wounds and his fingers were "blown off" his left hand. Am. Compl. ¶ 39. Yet between 10:32:48 p.m. when Mr. Kenyon was fully secured in handcuffs, and 10:42:34 p.m. when a police officer from another department began administering first aid, the Officers stood by as Mr. Kenyon lay fully restrained and rapidly losing blood. *Id.* ¶ 40. Although they had received first aid training and

had access to a first aid kit, the Officers refused to address Mr. Kenyon's medical needs.

In ignoring Mr. Kenyon's significant and readily apparent injuries, the Officers violated Mr. Kenyon's federal constitutional rights: Mr. Kenyon exhibited an objectively serious medical need to which the Officers were deliberately indifferent.

### 1.    Mr. Kenyon Had an Objectively Serious Medical Need.

A "serious medical need" is "one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention," and that "if left unattended, poses a substantial risk of serious harm." *Taylor v. Hughes*, 920 F.3d 729, 733 (11th Cir. 2019) (citations omitted). There can be no reasonable dispute that injuries resulting from gunshot wounds constitute an objectively serious medical need, and this Court has held exactly that. *Nicholas Wade v. Daniels*, 36 F.4th 1318, 1326 (11th Cir. 2022) ("There is no dispute here that a gunshot wound is an objectively serious medical need."). The district court acknowledged that Mr. Kenyon's "alleged gunshot-related wounds may have constituted a serious medical need," Order at 11–12, and the Officers' initial brief in this Court did not appear to contest that Mr. Kenyon had objectively

16

serious injuries. *See* Officers Br. 16–17. This element is therefore established.

### 2. The Officers Were Deliberately Indifferent to Mr. Kenyon's Serious Medical Needs.

The Officers' failure to administer any type of medical care during the ten-minute period where Mr. Kenyon was fully restrained and severely bleeding establishes their deliberate indifference. An officer acts with deliberate indifference when he "(1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk, and (3) engaged in conduct that amounts to subjective recklessness." *Stalley v. Cumbie*, 124 F.4th 1273, 1283 (11th Cir. 2024) (citing *Farmer v. Brennan*, 511 U.S. 825, 836–40 (1994)). This Court has explained that "[e]ven when medical care ultimately is provided, the officer might still act with deliberate indifference by delaying the treatment of serious medical needs." *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015) (citation modified). "[D]enying or delaying medical treatment is tantamount to unnecessary and wanton infliction of pain," and "the delay in care is, itself, a wanton infliction of pain and a constitutional violation." *Id.*

Mr. Kenyon has alleged sufficient facts to satisfy all three prongs. *First*, to allege the requisite subjective knowledge of serious harm, Mr.

Kenyon need allege enough information that would allow a fact finder to "infer the necessary subjective facts from circumstantial evidence—including inferences from the very fact that the risk was obvious." *Patel v. Lanier County*, 969 F.3d 1173, 1190 (11th Cir. 2020) (citation omitted).

Here, the Officers knew that Mr. Kenyon had been shot and that he was "bleeding profusely from his left thigh area, right rib cage area and several other areas, with his left middle finger blown off hanging in his palm and his left index finger tip blown off." Am. Compl. ¶ 39. Not only are "the risks associated with a gunshot wound … obvious," *Valderrama*, 780 F.3d at 1116, but the Officers also had medical training such that they "understood the need for tourniquets and things like that." Am. Compl. ¶ 97; *see Patel*, 969 F.3d at 1190 (observing that deputy sheriff "wasn't any ordinary layperson—he was trained as a medical first responder"). Indeed, when the police officer from another department arrived on scene, he immediately understood that Mr. Kenyon needed prompt medical attention and sprang into action.

*Second*, Mr. Kenyon has plausibly alleged that the Officers disregarded the risks he faced. As this Court has explained, "[t]he tolerable length of delay in providing medical attention depends on the

nature of the medical need and the reason for the delay." *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (per curiam) (citation omitted), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015). Situations involving "a delay in providing medical attention for life-threatening injuries," this Court has observed, are "'especially time-sensitive and must ordinarily be measured not in hours, but in *a few minutes*.'" *Nicholas Wade*, 36 F.4th at 1327 (quoting *Valderrama*, 780 F.3d at 1120) (emphasis added in *Nicholas Wade*).

Mr. Kenyon has alleged sufficient facts to show that the Officers disregarded his risk of serious harm when they failed to provide any medical attention for ten minutes. Although Officer Nevue had his medical kit with him in his car, which was just outside of Earl's, he did not try to retrieve it, even though he could have done so in 60–90 seconds (or less). Am. Compl. ¶ 41. In any event, the medical kit was not necessary to provide assistance, as evidenced by the fact that a police officer from a different department used Mr. Kenyon's belt as a tourniquet to save Mr. Kenyon's leg. *Id.* ¶ 40. And although Officer Garrison called for EMS at approximately 10:30 p.m., she also did not provide first aid after Mr. Kenyon had been secured in handcuffs, nor did

she direct any of the other officers on the scene (her subordinates) to do so. *Id.* ¶ 42.

This Court's caselaw confirms that the Officers' disregard for the serious harm Mr. Kenyon faced during this ten-minute delay can constitute deliberate indifference, given the severity of his injuries. In *Nicholas Wade*, this Court concluded that a jury could reasonably find that investigators disregarded the risk of harm when they waited just four minutes to call an ambulance after an arrestee had suffered three gunshot wounds and had a mouthful of blood. 36 F.4th at 1327. Similarly, in *Valderrama*, the Court determined that a jury could find that police officers disregarded a serious risk of harm to an arrestee who they had shot because the record indicated that they caused an ambulance's arrival to be delayed by seven minutes. 780 F.3d at 1117–20. In *Patel*, the Court concluded that a jury could find the defendant disregarded the risk of harm when he placed a pretrial detainee in an unventilated, un-air-conditioned van and took no action when the detainee was unconscious, sweating, and hyperventilating. 969 F.3d at 1191. And in *Bozeman*, the Court determined that a jury could find that corrections officers disregarded the risk to an inmate who was unconscious or not

breathing and the officers failed to call for medical help, administer cardiopulmonary resuscitation (CPR), or otherwise help him for fourteen minutes. 422 F.3d at 1273.

It directly follows from these cases—all of which advanced past the pleadings stage—that Mr. Kenyon has alleged sufficient facts to show that the Officers disregarded the risk of his injuries when they stood idle and "provided no intervention" during the ten-minute period he heavily bled from his gunshot wounds. *See Patel*, 969 F.3d at 1190. Here, as in other cases, the Officers had the requisite medical training and supplies to provide an initial response while waiting for the EMS team. *See id.* (noting officer was "trained as a medical first responder").

But rather than respond to Mr. Kenyon's injuries as other officers would—such as the officer from another department here or an officer in another case who testified he would "not let a shooting victim sit there for ten minutes," *Valerrama*, 780 F.3d at 1121—the Officers made the unacceptable and unconstitutional choice to do nothing. *See Bozeman*, 422 F.3d at 1273 ("[B]ecause of the urgent nature of the medical need in this case and because of the (lack of any) reason for the corresponding delay in care, a delay of fourteen minutes is actionable under the

Constitution, given the circumstances here."). It makes no difference that Officer Garrison called police dispatch and requested EMS because this call alone does not justify or explain the Officers' failure to provide "real medical attention, much like applying a Band-Aid would neither justify nor explain a delay in seeking medical attention for a stab wound." *Nicholas Wade*, 36 F.4th at 1327. Indeed, the Sixth Circuit has held that an officer did not respond reasonably to the risk of harm to an arrestee who "lay face down, bleeding from multiple gunshot wounds," because it was "unreasonable" for the officer "to stand idle—even for a few minutes and even while paramedics were on their way—rather than administer the first aid he was trained to provide." *Heeter v. Bowers*, 99 F.4th 900, 917 (6th Cir. 2024).

*Third*, assuming such a requirement applies in this case, Mr. Kenyon has plausibly alleged that the Officers' failure to act was reckless. This Court has recently clarified that in the context of deliberate-indifference claims under the Eighth Amendment this recklessness standard means that a defendant must "actually kn[o]w that his conduct—his own acts or omissions—put the plaintiff at substantial risk

22

of serious harm." *Betty Wade v. McDade*, 106 F.4th 1251, 1253 (11th Cir. 2024) (en banc).

As an initial matter, this Court's decision in *Betty Wade* addressed a deliberate-indifference claim brought under the Eighth Amendment, and this Court should not apply the subjective standard applicable in that context. Although this Court has previously stated that "the standards under the Fourteenth Amendment are identical to those under the Eighth," *see, e.g.*, *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007), that conclusion predates the Supreme Court's decision in *Kingsley*, which explained that "[t]he language of the[se] two Clauses differs, and the nature of the claims often differs." 576 U.S. at 400. Indeed, *Betty Wade*'s focus on the text and history of the Eighth Amendment underscores that the deliberate-indifference standard applied under the Eighth Amendment, which concerns *punishments* for those who have already been convicted, *see Betty Wade*, 106 F.4th at 1256–57, 1259, differs from that of the Fourteenth Amendment, which ensures rights for pretrial detainees or arrestees who have not yet been— and may never be—convicted of crimes. *See Kingsley*, 576 U.S. at 400

23

("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all.").

Reflecting this understanding, several other circuits have now held that the relevant standards are different and deliberate-indifference claims under the Fourteenth Amendment can proceed under "a purely objective standard." *See Short v. Hartman*, 87 F.4th 593, 604–05 (4th Cir. 2023) (concluding that *Kingsley* abrogates circuit precedent holding that deliberate-indifference standards are identical and joining Second, Sixth, Seventh, and Ninth Circuits); *see also Gordon v. County of Orange*, 888 F.3d 1118, 1120, 1122–25 (9th Cir. 2018); *Darnell v. Pineiro*, 849 F.3d 17, 34–35 (2d Cir. 2017); *Miranda v. County of Lake*, 900 F.3d 335, 351–52 (7th Cir. 2018); *Brawner v. Scott County*, 14 F.4th 585, 596 (6th Cir. 2021). Although, in a footnote, this Court has seemingly adhered to its prior position, *see Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (suggesting without significant analysis that *Kingsley* does not abrogate circuit precedent), the reasoning of the en banc Court in *Betty Wade* undermines that drive-by legal conclusion, and this Court should adopt the standard embraced by the majority of circuits.

24

In all events, assuming a recklessness showing is required, Mr. Kenyon alleged that the Officers knew that their failure to assist Mr. Kenyon placed him at a substantial risk of harm. As part of the Officers' ordinary job responsibilities, they would understand the importance of an immediate medical response in the context of severe injuries like gunshot wounds. Indeed, the Amended Complaint alleges that Officer Nevue has affirmatively indicated that he "understood the need for tourniquets and things like that." Am. Compl. ¶ 97. The Officers cannot reasonably contend at this stage (where all inferences are taken in Mr. Kenyon's favor) that they did not understand that their failure to act put Mr. Kenyon at substantial risk of harm. *See Valderrama*, 780 F.3d at 1120 ("[A] reasonable jury could conclude that [the officers] were more than grossly negligent when they delayed [the arrestee's] medical care for more than ten minutes for no good or legitimate reason as he faced life-threatening injuries."); *Patel*, 969 F.3d at 1190 (deputy sheriff's conduct "was worse than gross negligence because [deputy] utterly refused to respond to the severe symptoms that he saw" (citation omitted)).

### 3.    The Contrary Contentions of the District Court and the Officers Fail.

The district court erroneously concluded that Mr. Kenyon's allegations fail to show that the Officers disregarded the risk of serious harm he faced. The court acknowledged that there was a ten-minute period in which the Officers allowed Mr. Kenyon to lie bleeding, but it nevertheless summarily announced that the Officers "promptly provided medical care." Order at 12. It is difficult to understand what "prompt" "medical care" Mr. Kenyon can be said to have received. That conclusion, moreover, cannot be reconciled with this Court's cases explaining that four-minute and seven-minute gaps can constitute deliberate indifference when an arrestee has sustained gunshot injuries. *See Nicholas Wade*, 36 F.4th at 1327; *Valderrama*, 780 F.3d at 1117–20. The ten-minute gap here, at minimum, states a claim for relief permitting this suit to go forward.

The Officers' arguments are similarly deficient. They first suggest that Mr. Kenyon's allegations "fail[] to show [the Officers] actually knew about a condition that posed a substantial risk of serious harm." Officers Br. 18. But that suggestion strains credulity given the severity of Mr. Kenyon's injuries, including that he was "profusely bleeding," as well as

26

the fact that another officer immediately attempted to provide medical assistance after arriving on scene. Am. Compl. ¶40.

The Officers next contend that they did not "d[o] absolutely nothing" to address Mr. Kenyon's injuries because Officer Garrison called dispatch for an EMS team. Officers Br. 18. But that purported response alone was insufficient. Courts have rejected a "bright-line rule that officers never have to provide care after calling for help," and there are no cases accepting that "calling for a paramedic always terminates a police officer's constitutional obligations to a pretrial detainee— irrespective of the time it will take for help to arrive, how urgently help is needed, how the officer has been trained, or even how easy it would be for the officer to help." *Heeter*, 99 F.4th at 918; *McRaven v. Sanders*, 577 F.3d 974, 983 (8th Cir. 2009) ("An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference.").

Here, the Officers cannot argue that they were busy with other responsibilities, such as "protecting themselves or the public," *Heeter*, 99 F.4th at 919; instead, during the ten-minute gap, they "exited and reentered [the] building a couple of times but not once did [they] … render

any type of first aid/medical attention." Am. Compl. ¶ 42; *see also Heeter*, 99 F.4th at 919 ("A reasonable jury could find that [the arrestee's] critical injury called for immediate first aid before professional paramedics arrived, and that [the officer]—trained in first aid and unoccupied by police duties—could and should have rendered that care.").

Finally, the Officers argued that "this incident constituted one which was tense, uncertain, and rapidly evolving." Officers Br. 18. But the Officers were idle for nearly ten minutes after Mr. Kenyon was handcuffed and fully restrained. From that point forward, the situation with Mr. Kenyon was no longer "tense" or "rapidly evolving," and there are no allegations suggesting there were any developments that hampered the Officers' ability to provide Mr. Kenyon with first aid. *See Nicholas Wade*, 36 F.4th at 1327 ("[T]he investigators provide no justification for why it took eleven investigators four minutes to call an ambulance when [an officer] had searched, handcuffed, and restrained [the arrestee]." (emphasis omitted)). The Officers thus cannot seriously contend at this stage of the case that their indifference was excused by the factual circumstances.

**B.    Qualified Immunity Does Not Save the Officers from This Suit.**

1. Qualified immunity cannot rescue the Officers from their disregard of Mr. Kenyon's constitutional rights. Qualified immunity attaches only when an officer's conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). This Court has enumerated three ways to establish that a right was clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc) (citation omitted). Defeating qualified immunity does not require a showing that "the very action in question has … previously been held unlawful"; rather "a general constitutional rule may apply with obvious clarity to the specific conduct in question." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (alteration adopted).

29

When considering whether officers are entitled to qualified immunity for deliberate indifference claims, this Court has explained that "it is 'clearly established that an official acts with deliberate indifference when he intentionally delays providing access to medical treatment, knowing the arrestee has a life-threatening condition or an urgent medical condition that would be exacerbated by delay.'" *Valderrama*, 780 F.3d at 1121 (quoting *Lancaster v. Monroe County*, 116 F.3d 1419, 1425 (11th Cir. 1997)) (alterations adopted); *Patel*, 969 F.3d at 1190 ("The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference." (citation omitted)).

This Court has thus put "*all* law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do nothing to address it, they violate the Constitution." *Patel*, 969 F.3d at 1190 (emphasis modified). Indeed, as early as 1990, this Court announced that when officers "ignore without explanation a[n] [arrestee's] serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990); *see also Harris v.*

30

*Coweta County*, 21 F.3d 388, 394 (11th Cir. 1994) (similar). And, as this Court has explained, it is therefore "unlikely that an officer will be able to avail himself of qualified immunity where … the evidence allows an inference that he was aware of and flatly ignored a serious risk of harm requiring medical attention just because our prior case law didn't put him on notice of that risk." *Patel*, 969 F.3d at 1191 n.11 (emphasis omitted).

2. These principles control here. The Amended Complaint sufficiently alleges that the Officers had actual knowledge that Mr. Kenyon needed immediate medical assistance. And it further alleges that the Officers refused to adequately respond, allowing Mr. Kenyon to lie in severe pain and to lose a life-threatening amount of blood. Those circumstances are sufficient to defeat qualified immunity given the alleged "knowledge and intentional refusal." *Patel*, 969 F.3d at 1190; *see also Lancaster*, 116 F.3d at 1427–28 (no qualified immunity when officers "knew [plaintiff] had urgent medical needs that would be significantly exacerbated by delay" and officers "delayed obtaining treatment for [plaintiff] until after he suffered a seizure").

This Court's decision in *Valderrama* is particularly instructive. There the Court warned that "delays even of only a 'few minutes' in

31

seeking care for life-threatening injuries can constitute deliberate indifference." *Valderrama*, 780 F.3d at 1122; *see also Nicholas Wade*, 36 F.4th at 1327 (issued after events in this case but applying established precedent and recognizing that officers were deliberately indifferent when they waited four minutes to call an ambulance to assist an arrestee who had suffered gunshot wounds). In *Valderrama*, an officer was not entitled to qualified immunity when his actions delayed an ambulance's arrival by approximately seven minutes after the arrestee suffered a gunshot wound. 780 F.3d at 1118, 1122. As one officer in that case testified, "it is improper to allow a shooting victim to wait longer than ten minutes for an ambulance," and the officer noted he would "not let a shooting victim sit there for ten minutes," as he "would have just thrown him in [his] car and driven to the hospital." *Id.* at 1121 (alteration adopted). *Valderrama* thus highlights that, in the context of the *same injuries* that Mr. Kenyon suffered and an even *shorter* delay, this Court has already held that officers are not entitled to qualified immunity. *See id.* It follows *a fortiori* from *Valderrama* that the Officers cannot claim qualified immunity here.

32

Beyond *Valderrama*, this Court also rejected qualified immunity for an officer who knew an arrestee was unconscious and not breathing for fourteen minutes and did nothing because the violation "should have been obvious to any objectively reasonable correctional officer." *Bozeman*, 422 F.3d at 1274; *see also Brown*, 894 F.2d at 1538 (when plaintiff suffers serious and painful injury, "it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves"). *Bozeman* shows that "the principles from relevant precedents were clear enough that the officers had notice" that their inexplicable delay violated Mr. Kenyon's rights. *Valderrama*, 780 F.3d at 1122.

3. The Officers also cannot claim they are entitled to qualified immunity merely because Officer Garrison called dispatch for EMS personnel. That response alone is insufficient to discharge the Officers' responsibilities in circumstances like these where Mr. Kenyon sustained life-threatening injuries, and the Officers had the requisite training and access to supplies to help mitigate the harm. *See McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("[T]he nature of the medical need is relevant in determining what type of delay is constitutionally

intolerable."); *Valderrama*, 780 F.3d at 1122 (assessing life-threatening injuries); *Bozeman*, 422 F.3d at 1273 (similar).

A common facet of first aid training (and common sense) is the need to respond to life-threating injuries; that principle has been reaffirmed repeatedly in this Court's extensive caselaw discussing the importance of responding properly to life-threatening injuries. It would therefore have been obvious to the Officers that simply calling EMS—and then doing *nothing* for ten minutes—was not an adequate response. And that point is driven home by the actions of the officer from a different department who immediately applied lifesaving first aid after arriving on the scene and observing the severe nature of the injuries. *See Heeter*, 99 F.4th at 919 ("Even the other officers at the scene seemed to have recognized their obligation to try to save [the arrestee's] life: [The other officers] at least held [the arrestee's] head out of the puddle of blood so he could breathe and offered him words of encouragement.").

The obvious nature of the Officers' obligation is further highlighted by several cases from other circuits explaining that dispatching EMS personnel is insufficient in these circumstances. *See Gilmore*, 144 F.4th at 1263 ("[P]ersuasive decisions from other circuits can be considered in

34

determining whether a violation was one of 'obvious clarity' for purposes of qualified immunity."). For example, the Sixth Circuit had held that officers were not entitled to qualified immunity when they called EMS but otherwise "fail[ed] to provide aid" to a handcuffed arrestee who was not breathing because "[t]he right of a suspect in custody to receive adequate medical care … was clearly established." *Jones v. City of Cincinnati*, 521 F.3d 555, 560 (6th Cir. 2008); *see also Heeter*, 99 F.4th at 920–21 (denying qualified immunity because officer "had an obligation to provide [arrestee] with immediately necessary medical care; his decision to instead stand idle violated the Constitution"). Similarly, courts have denied qualified immunity for an officer who "was aware of [the inmate's] medical need and was capable of providing assistance" yet "failed to do so." *McRaven*, 577 F.3d at 983; *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1083 (9th Cir. 2013) (denying summary judgment because jury could conclude that "officers trained to administer CPR who nonetheless did not do so despite an obvious need demonstrated the deliberate indifference required for an Eighth Amendment claim").

In short, the Officers had ample notice that their failure to respond to Mr. Kenyon's injuries would constitute deliberate indifference, and they are not entitled to qualified immunity.

## II.    Mr. Kenyon States a Claim for Excessive Force.

The district court further erred when it dismissed Mr. Kenyon's claims against the Officers for use of excessive force under the Fourth Amendment. The Amended Complaint alleges that the Officers fired *sixteen* shots at Mr. Kenyon—fifteen of which were fired by Officer Nevue—even though Mr. Kenyon's firearm "was pointed at the ground" and he "never made any aggressive movements with the weapon whatsoever." Am. Compl. ¶ 30. What's more, Officer Nevue fired all these rounds even though he did not know that Mr. Kenyon had a firearm, as Officer Nevue was not able to see the weapon "throughout the incident." *Id.* The use of deadly force thus violated Mr. Kenyon's constitutional rights.

### A.    The Officers Used Excessive Force in Violation of the Fourth Amendment.

Excessive force claims are analyzed "under the Fourth Amendment's 'objective reasonableness' standard." *Oliver v. Fiorino*, 586 F.3d 898, 905 (11th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386,

36

388 (1989)). The Court "pay[s] 'careful attention to the facts and circumstances' of the case, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (citation omitted). An officer may use deadly force only when he (1) "'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm;' (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible." *Vaughan v. Cox*, 343 F.3d 1323, 1329–30 (11th Cir. 2003) (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)).

1. ***Serious Threat of Harm.*** The Officers lacked probable cause to believe that Mr. Kenyon posed a serious threat of harm or had committed a crime involving the infliction of serious harm. Mr. Kenyon was not engaged in any criminal activity when Officers Nevue and Singh first approached him at Earl's, and he did not present a threat to the Officers

37

or anyone else. Am. Compl. ¶¶ 26–27. The Officers then failed to inform him, before physically restraining him, that they had a warrant or that he was otherwise under arrest. *See id.* Mr. Kenyon then attempted to exit Earl's and was holding a firearm in his hand that was "pointed at the ground." *Id.* ¶¶ 29–30. Although Officer Singh saw the firearm, Officer Nevue "could not see the gun," and did not know that Mr. Kenyon had a firearm when he began shooting at Mr. Kenyon and Officer Singh. *Id.*¶ 30. Indeed, it was "impossible" that Officer Nevue, "at the time he fired his weapon, had any knowledge that [Mr.] Kenyon had a weapon in his hand or posed any serious physical harm to [the] officers or others." *Id.*¶ 31. Officer Nevue initially fired five rounds before Officer Singh and Mr. Kenyon fell under the adjacent pool table, and Officer Nevue then fired another ten shots while Mr. Kenyon was alone under the table. *Id.* ¶¶ 35–36.

Had the district court properly accepted the truth of Mr. Kenyon's allegations, as it must at this stage, *see Saunders v. Duke*, 766 F.3d 1262, 1270–71 (11th Cir. 2014), it was not reasonable for Officer Nevue to initially fire at Mr. Kenyon. If Officer Nevue did not know that Mr. Kenyon had a firearm, as the Amended Complaint alleges, then there

was no reason to believe that Mr. Kenyon posed an imminent threat. Mr. Kenyon was not committing a crime when the Officers entered Earl's, and the record does not provide any further reason to believe that he was dangerous. *See Morton*, 707 F.3d at 1281–82; *Perez v. Suszczynski*, 809 F.3d 1213, 1219 (11th Cir. 2016).

Even if the Officers had seen Mr. Kenyon's firearm, it does not follow that the sixteen total shots they fired were reasonable.[1] This Court has explained that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." *Perez*, 809 F.3d at 1220. Several factors remain "crucial to the reasonableness determination," including "[w]here the weapon was, what type of weapon it was, and what was happening with the weapon." *Id.*

Here, those factors indicate that the use of deadly force against Mr. Kenyon was not reasonable. The Amended Complaint alleges that Mr. Kenyon's firearm "was pointed at the ground" and that he "never made any aggressive movements with the weapon whatsoever." Am. Compl. ¶ 30. Without seeing Mr. Kenyon raise the weapon or make any type of

---

[1] According to the Amended Complaint, Officer Garrison saw Mr. Kenyon's firearm before she started shooting. *See* Am. Compl. ¶ 33.

threatening gesture, and without providing any type of verbal command to drop the weapon, the Officers' decision to start shooting as their initial reaction to seeing that Mr. Kenyon had a firearm amounted to excessive force. *See Lundgren v. McDaniel*, 814 F.2d 600, 602–03 (11th Cir. 1987) (in case where gun was present, jury "could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without provocation shot at a nondangerous suspect").

The second set of ten additional shots was also an unreasonable use of deadly force. "[W]hile the use of deadly force may initially be justified, the level of force that is reasonable may change during the course of a police encounter." *Hunter v. City of Leeds*, 941 F.3d 1265, 1280 (11th Cir. 2019). Once Mr. Kenyon was underneath the pool table, the Officers fired several rounds at him in rapid succession without any regard for whether the additional shots were justified. In so doing, the Officers failed to react appropriately to the diminished threat Mr. Kenyon posed when he was underneath the table and focused on protecting himself against the rapid succession of shots from Officer Nevue. Am. Compl. ¶¶ 35–37. A reasonable officer would have reconsidered the apparent nature of the

40

threat once the circumstances significantly changed (*i.e.*, once Mr. Kenyon was underneath the table). *See Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015) (excessive force for officer to shoot after immediate threat had dissipated and plaintiff "was retreating, apparently unarmed, and outside of striking distance").

*Escape.* Deadly force was also not warranted based on any concerns about escape because the Officers could not reasonably believe that Mr. Kenyon was attempting to escape. The Amended Complaint alleges that, after Officers Singh and Nevue first approached Mr. Kenyon and asked him "can we talk outside," Mr. Kenyon "began walking at a normal pace toward the west exit of Earl's." Am. Compl. ¶ 26. Mr. Kenyon perceived this to be a consensual encounter, but the Officers then tried to restrain him without providing verbal commands or explaining why they were seizing him. *Id.* ¶¶ 27–28. Mr. Kenyon thus attempted to pull away and continue moving towards the west exit. *Id.* ¶ 29. Additionally, Officer Nevue fired ten of the fifteen total shots after Mr. Kenyon was already underneath the pool table—attempting to protect himself from Officer Nevue's gunshots and not trying to escape. *Id.* ¶¶ 35–36.

41

Taking the allegations as true and making inferences in Mr. Kenyon's favor, as this Court must, the Officers could not reasonably believe that deadly force was necessary to prevent Mr. Kenyon's escape. Before the first set of shots, Mr. Kenyon's actions in tandem with the Officers' only alleged verbal cue—that they wanted to talk outside— yields the inference that Mr. Kenyon moved towards the west exit in an effort to comply with the Officers' request. Indeed, it is entirely unreasonable for officers to invite an individual to leave a building and then use that individual's movement toward the exit as an excuse for deadly force. And before the second set of shots, Mr. Kenyon was on the floor *underneath the pool table*, leaving no reasonable basis for the Officers to believe that he was trying to flee or escape. *Cf. Hunter*, 941 F.3d at 1280 ("No reasonable officer under these circumstances would believe that [plaintiff] posed such a serious risk of escape that it was necessary to use deadly force, given that [plaintiff] was no longer actively fleeing and was surrounded by at least four police officers.").

***Warning.*** The Officers' use of deadly force was also excessive because they did so without providing Mr. Kenyon a warning that they would start shooting. According to the Amended Complaint, the first set

42

of shots occurred when Officer Nevue had not even seen Mr. Kenyon's firearm. Am. Compl. ¶ 31. As a result, Officer Nevue would have had ample opportunity to warn Mr. Kenyon that he was about to start shooting.

A warning was also feasible for the second set of shots. When the Officers started firing, Mr. Kenyon was underneath the pool table and did not pose an immediate threat. The Officers could have provided him with a verbal command to release his weapon, rather than fire several shots in rapid succession at an individual who was attempting to hide and take cover. Am. Compl. ¶¶ 35–36. Taking the facts as true, a reasonable jury could conclude that the Officers "had the time and opportunity to warn [Mr. Kenyon] that [they] w[ere] planning to use deadly force before [they] opened fire." *Vaughan*, 343 F.3d at 1331; *see also Salvato*, 790 F.3d at 1293 ("a jury could find that the distance between [the officer] and [the plaintiff] establishes that it was feasible" to provide a warning (citation modified)).

2. The district court erred when it held that the Officers' use of force was objectively reasonable. The court focused heavily on the fact that Mr. Kenyon possessed a firearm, Order at 9, without any consideration for

43

this Court's caselaw explaining that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." *Perez*, 809 F.3d at 1220.

The district court also apparently declined to credit Mr. Kenyon's allegations that Officer Nevue had not seen Mr. Kenyon's firearm when the first shots were fired. Order at 9 (suggesting the Officers "fired their shots" after Mr. Kenyon was under the pool table). But the court was required to accept all Mr. Kenyon's allegations as true, including that Officer Nevue "could not see the gun and did not have knowledge" that Mr. Kenyon "had a weapon when [Officer] Nevue drew and discharged his firearm." Am. Compl. ¶ 30; *Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1212 (11th Cir. 2015) (reversing district court when it was "clear that the District Court did not accept [the plaintiff's] facts as true"). And the district court also failed to consider other important factors, including that Mr. Kenyon was underneath the pool table when many of the shots were fired and that the Officers did not even attempt to provide him with a warning in between the first and second sets of shots. *See* Order at 9–10. When viewing the allegations in the light most favorable

44

to Mr. Kenyon, the Officers' use of deadly force was not warranted, and his excessive force claim should go forward.

## B. The Officers Are Not Entitled to Qualified Immunity for Their Excessive Use of Force.

The Officers enjoy no qualified immunity for their unconstitutional use of deadly force. "The Supreme Court identified a constitutionally protected right to be free from excessive force as early as 1985." *Perez*, 809 F.3d at 1222 (citing *Garner*, 471 U.S. at 11). And "[u]sing deadly force in a situation that clearly would not justify its use is unreasonable under the Fourth Amendment." *Mercado v. City of Orlando*, 407 F.3d 1152, 1160 (11th Cir. 2005). This Court has further explained that while "officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours with materially identical facts, so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights." *Salvato*, 790 F.3d at 1294 (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004)) (alterations adopted).

To the extent that Officer Nevue did not initially know that Mr. Kenyon had a firearm, this Court has repeatedly stated that "the use of deadly force against a non-resisting suspect who posed no danger violates

a suspect's Fourth Amendment right to be free from excessive force." *Morton*, 707 F.3d at 1283; *see also Mercado*, 407 F.3d at 1160 ("clearly established principle that deadly force cannot be used in non-deadly situations"); *Perez*, 890 F.3d at 1222; *Salvato*, 790 F.3d at 1294.

Even setting aside the allegation regarding Officer Nevue's knowledge, the Officers had fair notice that the presence of a firearm is not sufficient to allow the use of deadly force without consideration of all relevant factors. In *Perez*, this Court explained that law enforcement officers must consider "[w]here the weapon was, what type of weapon it was, and what was happening with the weapon." 809 F.3d at 1220. Because those factors are "crucial" to determining how much force is objectively reasonable, *id.*, the Officers should have understood that they could not reflexively fire without considering the totality of whether Mr. Kenyon posed an imminent threat. Similarly, in *Lundgren*, this Court held that the police used excessive force, even when the suspect had a weapon, because a jury "could have reasonably believed that the officers were neither threatened by a weapon, nor appeared to be threatened by a weapon, nor were fired upon, but rather that the officers without

provocation shot at a nondangerous suspect." 814 F.2d at 602–03. Put simply, possession of a firearm is not sufficient to justify deadly force.

## III.    Mr. Kenyon States a Claim Against the City.

The district court also erred in dismissing Mr. Kenyon's claim against the City because its deficient policy and failure to train the Officers caused his injury. When Officer Nevue was asked by the Florida Department of Law Enforcement and the State Attorney's Office whether he received any advanced training, he did not indicate that he received any specific training in the constitutional limitations on the use of deadly force. Am. Compl. ¶ 57. And the City's policies were insufficient to inform police officers how and when deadly force should be exercised.

Under the Supreme Court's decision in *Monell*, a municipality can be held liable for violations of an individual's federal rights. *See* 436 U.S. at 688–89. To impose liability, a plaintiff must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

Mr. Kenyon has alleged sufficient facts to state a claim against the City that satisfies all three requirements.

*First*, Mr. Kenyon's Fourth and Fourteenth Amendment rights were violated when the Officers used excessive force against him and were deliberately indifferent to his serious medical needs. *See supra* at 15–28, 36–44.

*Second*, the City was deliberately indifferent to the violations of Mr. Kenyon's rights. In the context of failure to train, a municipality is deliberately indifferent when it "knew of a need to train and/or supervise in a particular area and … made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

Here, the City knew about the importance of training its officers on the use of deadly force. The Supreme Court has made clear that "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989). And the City has some relevant policies in place, including a training program to teach officers

about the use of firearms, and a policy concerning the use of force with guidelines about when force should be used. Am. Compl. ¶¶ 53–54.

Yet despite knowing about the importance of proper procedures, the City permitted Officer Nevue to work in the field without the requisite training. Officer Nevue's personnel file indicates that he did not receive training on the proper use of firearms or in the constitutional limitations on the use of deadly force, besides a "firearm qualification standard," which taught him only how to shoot faster. *Id.* ¶ 58. And in an interview after the incident, he admitted that he never received advanced training on the use of deadly force. *Id.* ¶ 57. Absent such training, it was improper to allow Officer Nevue to attempt to serve as an officer without training on something so important and obvious as the use of deadly force. *See Depew v. City of St. Marys*, 787 F.2d 1496, 1498 (11th Cir. 1986) (affirming verdict against city when there was evidence that officers "received inadequate training concerning the use of force in any given situation and when the use of deadly force was proper"); *Vineyard v. County of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (observing that sheriff's department "had no policies and procedures manual" and affirming decision that county "had inadequate policies of supervision,

discipline and training of deputies"); *Favors v. City of Atlanta*, 849 F.
App'x 813, 820–21 (11th Cir. 2021) (denying summary judgment because
city provided "*no* academy or in-service training specifically addressing
the circumstances that would justify an officer shooting into a moving
vehicle").

*Third*, Mr. Kenyon has plausibly alleged that the City's failure
caused his injuries. In a failure-to-train case, "the identified deficiency in
a city's training program must be closely related to the ultimate injury."
*City of Canton*, 489 U.S. at 391. "[A] single constitutional violation may
result in municipal liability when there is sufficient independent proof
that the moving force of the violation was a municipal policy or custom."
*Vineyard*, 990 F.2d at 1212 (citation omitted).

Here, Mr. Kenyon has stated sufficient facts to plausibly show that
the City's failure to train Officer Nevue caused his injuries. If Officer
Nevue had been properly trained on the use of deadly force, it is plausible
that he would not have fired his weapon at Mr. Kenyon before he was
even able to see Mr. Kenyon's weapon. Am. Compl. ¶¶ 55–59. And even
after he had seen Mr. Kenyon's weapon, with the proper training Officer
Nevue would have understood that Mr. Kenyon posed less of a threat

once he was underneath the pool table, and Officer Nevue thus might not have fired several additional shots in rapid succession that injured Mr. Kenyon. In these circumstances, Mr. Kenyon has alleged sufficient facts to be permitted to continue pressing his claims against the City to determine the extent to which the City's failure to train its officers caused his injuries.

## IV. The District Court Should Reconsider Supplemental Jurisdiction.

Because Mr. Kenyon states a federal claim against the Officers, this Court should instruct the district court to reconsider whether to exercise supplemental jurisdiction over Mr. Kenyon's state-law claims for negligence and battery.

The district court's decision to decline supplemental jurisdiction over these claims was premised on its decision that Mr. Kenyon failed to state a federal claim. Order at 12. However, if this Court reverses the district court's decision and revives Mr. Kenyon's claims, it would also be appropriate for the district court to exercise jurisdiction over the state-law claims that arise from the same incident "to preserve judicial resources and avoid inconsistent judgments." *St. Paul Fire & Marine Ins. Co. v. Nat'l Union Fire Ins. Co.*, 890 F.3d 1265, 1268 (11th Cir. 2018); *see*

*also Palmer v. Hosp. Auth. of Randolph Cnty.*, 22 F.3d 1559, 1569 (11th Cir. 1994) ("[W]henever a federal court has supplemental jurisdiction under section 1367(a), that jurisdiction should be exercised unless section 1367(b) or (c) applies.").

In similar circumstances, this Court has remanded to the district court with instructions to reconsider supplemental jurisdiction. *See, e.g.*, *Bravo v. Loor-Tuarez*, 727 F. App'x 572, 577 (11th Cir. 2018); *Turner v. Jones*, 415 F. App'x 196, 203 (11th Cir. 2011); *Payton v. City of Florence*, 413 F. App'x 126, 133–34 (11th Cir. 2011). It should do the same here.

## CONCLUSION

The Court should reverse the district court's order granting Defendants' motions to dismiss and remand for further proceedings.

Respectfully Submitted,

*/s/ Sameer Aggarwal*

Abby Wright
Sameer Aggarwal
  *Counsel of Record*
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-5434
saggarwal@cov.com

*Counsel for Plaintiff-Appellant*
*Ward Lawrence Kenyon*

August 27, 2025

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

WARD LAWRENCE KENYON,

        *Plaintiff-Appellant,*

    v.

CITY OF SEBASTIAN, BRAEDEN
NEVUE, and MELISSA GARRISON,

        *Defendants-Appellees.*

No. 23-10946

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, I hereby certify that the foregoing brief complies with the word limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 10,460 words. I further certify that the brief complies with the typeface and type style requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Times New Roman font.

53

/s/ *Sameer Aggarwal*
Sameer Aggarwal

*Counsel for Plaintiff-Appellant*
*Ward Lawrence Kenyon*

August 27, 2025